# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | Case No. |
| **OBINNA OGBU,** | |
| **Defendant.** | |

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Obinna Ogbu, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the government could prove the below facts beyond a reasonable doubt:

*Overview*

1.     The defendant, Obinna Ogbu, knowingly agreed with others to commit federal crimes by devising and executing a scheme and artifice to: (i) defraud the District of Columbia and the Washington Metropolitan Area Transit Authority of money and property by means of false and fraudulent pretenses, representations, and promises; and (ii) defraud and deprive the District of Columbia and the District's citizens of the honest services of a public official through bribery and kickbacks.  As a result of actions taken in furtherance of that agreement, two companies associated with Ogbu improperly received roughly $2 million in funds originating from government contracts.  This caused an actual loss of more than $150,000 to government agencies.

1

*Relevant Individuals and Entities*

2. Ogbu worked at the Washington Metropolitan Area Transit Authority ("WMATA") as an Information Technology ("IT") Customer Support Manager. Ogbu began his employment at WMATA in 2016.

3. Ogbu was friends with Co-Conspirator 1. During the times relevant to the offense, Co-Conspirator 1 worked for the United States Department of Agriculture ("USDA") as an engineer. Co-Conspirator 1 was also the Principal of Highbury Global Group, Inc. ("Highbury").

4. Co-Conspirator 2 was employed at WMATA as a contract administrator from 2016 to January 2019. Ogbu and Co-Conspirator 2 met at WMATA. They began a romantic relationship in or around 2017. In early 2018, Ogbu introduced Co-Conspirators 1 and 2 to one another.

5. After Co-Conspirator 2 stopped working at WMATA in 2019, she started working at the District of Columbia's Office of Contracting and Procurement ("OCP") as a contracting specialist. In this capacity, Co-Conspirator 2 worked within OCP to help manage government contracting activities such as advertising, negotiation, price analysis, bid selection, and contract implementation. Co-Conspirator 2 worked at OCP as a contracting specialist until the fall of 2023.

6. On January 21, 2021, Highbury registered to do business in the District of Columbia (the "District"). Ogbu was listed as Highbury's Resident Agent on the registration.

7. In July 2021, Ogbu registered The Nupath Company ("Nupath"). Co-Conspirators 1 and 2 were aware that Ogbu had created Nupath. The company was created to help Ogbu and his co-conspirators access and obtain government contracting business.

*Highbury's Ill-Gotten Business Opportunities Involving WMATA*

8. Beginning in 2018, Ogbu and Co-Conspirator 1 agreed to use Ogbu's official position at WMATA and access to Co-Conspirator 2 to steer government contracting business to Highbury. In return, Co-Conspirator 1 provided things of value to Ogbu.

9. In January 2018, Ogbu was designated as a Contracting Officer Technical Representative ("COTR") for a WMATA contract seeking support services for WMATA's IT Helpdesk (the "IT Helpdesk Support Services Contract"). Ogbu also led the Technical Evaluation Team ("TET") for the contract.

10. Ogbu wrote the statement of work for the IT Helpdesk Support Services Contract. Co-Conspirator 2 was the WMATA contract administrator who publicized the contract and helped manage the contract award process.

11. The IT Helpdesk Support Services Contract was awarded to a private company. Ogbu used his position and influence to get the private company to continue to use Highbury—which was already being used by WMATA at that time because of Ogbu's previous efforts—until that private company was able to get its own provider for delivery services.

12. Through 2018 and 2019, Highbury earned $89,108.00 for its work on the IT Helpdesk Support Services Contract. During this time, Co-Conspirator 1 gave Ogbu things of value, usually in the form of cash payments stemming from Highbury profits.

13. Prior to and continuing after 2018, WMATA had contracted with private companies to help augment the staff WMATA used for IT-related services (the "IT Staff Augmentation Contract"). Beginning in 2018, Ogbu used his position at WMATA and access to Co-Conspirator 2 to steer business under the IT Staff Augmentation Contract to Highbury.

14. Ogbu drafted an independent cost estimate ("ICE") for a task order to be funded through the IT Staff Augmentation Contract. Under the task order, WMATA would contract for additional IT positions to be staffed by contractors under Ogbu's supervision. Ogbu used a non-WMATA e-mail address to share the draft ICE with Co-Conspirator 1. Once the task order was ready to be finalized, Ogbu worked with Co-Conspirator 2 to officially post the task order for public bidding.

15. Co-Conspirator 1 worked with potential prime contractors to get them to bid on the IT Staff Augmentation Contract with an agreement that Highbury, acting as a sub-contractor, would provide the prime contractors with the individuals who would do the work under the contract.

16. Prior to the submission of any bids, Ogbu used unofficial channels to communicate with Co-Conspirator 1 regarding which Highbury candidates the prime contractors would put forth as part of the prime contractors' bids.

17. On at least one occasion while Co-Conspirator 2 was still employed at WMATA, Co-Conspirator 2 acted in her official capacity as a WMATA contract administrator to send prime contractor bids to Ogbu (with the Highbury candidates that Ogbu was already aware of). Ogbu then used his position at WMATA to "evaluate" the candidates (who he had already evaluated in conversations with Co-Conspirator 1 before Co-Conspirator 1 sent the candidates to the prime contractors to use in the prime contractors' submissions to WMATA).

18. From 2018 through 2023, three separate prime contracting companies paid Highbury a combined total of over $400,000.00 for Highbury's performance on WMATA contracts. During this time, Co-Conspirator 1 made routine (often bi-weekly or monthly) cash

payments to Ogbu with the understanding that the payments were for Ogbu's help obtaining and maintaining WMATA-related work for Highbury.

19. Ogbu sought to conceal his connection to Highbury from WMATA, including on official documents and disclosures that required Ogbu to identify that connection. Among other things, Ogbu never disclosed: his conflict of interest with Highbury; the money he received from Highbury; or the official and private steps he had taken to help Highbury get business from the IT Staff Augmentation Contract.

*COVID-19 Testing Supplies Contract through OCP*

20. In January 2021, OCP began the process of helping the District's Department of Forensic Sciences ("DFS") hire a vendor to provide DFS with COVID-19 testing supplies (the "COVID-19 Testing Supplies Contract"). In her capacity as an OCP contracting specialist, Co-Conspirator 2 managed the contract solicitation, offer, and award. Ogbu, Co-Conspirator 1, and Co-Conspirator 2 agreed that Co-Conspirator 2 would take official steps and otherwise misuse her official position to steer the COVID-19 Testing Supplies Contract to Highbury. It was understood that, in exchange, Ogbu and Co-Conspirator 2 would materially benefit from any profits Highbury made from the contract.

21. Before the information was public, Co-Conspirator 2 alerted Ogbu and Co-Conspirator 1 to the upcoming solicitation for the COVID-19 Testing Supplies Contract. Co-Conspirator 2 provided her co-conspirators with non-public information about the upcoming solicitation, including information regarding contract pricing. Ogbu, Co-Conspirator 1, and Co-Conspirator 2 then repeatedly met privately to discuss the COVID-19 Testing Supplies Contract and the pre-award non-public information that Co-Conspirator 2 had provided.

22. Co-Conspirator 2 used her official position at OCP—and Ogbu and Co-Conspirator 1 used the inside information they received from Co-Conspirator 2—to ensure that Highbury was awarded the COVID-19 Testing Supplies Contract.

23. The District ultimately paid Highbury over $630,000 on the COVID-19 Testing Supplies Contract. Co-Conspirator 1 paid Ogbu over $140,000 for his help obtaining the contract. Co-Conspirator 1 instructed Ogbu to give $15,000 of the money in cash to Co-Conspirator 2 for her assistance getting the contract.

24. Throughout the COVID-19 Testing Supplies Contract solicitation, award, and execution, the conspirators sought to conceal, among other things, Co-Conspirator 2's connection to Highbury and the money that Highbury paid to Co-Conspirator 2 (through Ogbu).

*Nupath Contract Bids and Transactions*

25. Ogbu created the Nupath Company in July 2021. He did so with his co-conspirators' knowledge and with the intent to obtain additional contracting business for his enrichment.

26. Co-Conspirator 2 alerted Ogbu and Co-Conspirator 1 that the District planned to issue a solicitation involving third-party procurement of certain bi-directional amplifier monitoring services (the "BDA Contract").

27. Ogbu, Co-Conspirator 1, and Co-Conspirator 2 agreed to coordinate on the submission of multiple bids on the BDA Contract under the guise that each bid was independent. Ogbu submitted one bid on behalf of Nupath. Co-Conspirator 1 submitted another bid on behalf of Highbury. Co-Conspirator 2 used her official position at OCP to provide Ogbu and Co-Conspirator 1 with pre-award non-public information about the contract.

28.     In submitting the Nupath bid, Ogbu falsified records to conceal information relating to the various connections between Nupath, Highbury, and Co-Conspirator 2.

29.     Ultimately, neither Nupath nor Highbury was awarded the BDA Contract.

30.     In October 2021, Co-Conspirator 2 learned through her official OCP position of two contracts that the District's Metropolitan Police Department ("MPD") was looking to issue. First, MPD sought assistance obtaining Motorola "receive-only" earpieces for its officers (the "MPD Earpieces Contract"). Second, MPD sought external assistance with pre-employment suitability background investigations for officer candidates (the "MPD Recruiting Outsourcing Verification Contract"). Ogbu and Co-Conspirator 2 agreed that Co-Conspirator 2 would take steps to steer both MPD contracts to Ogbu and Nupath.

31.     For the MPD Earpieces Contract, Co-Conspirator 2 shared pre-award non-public contract and pricing information with Ogbu. The two used that information to create and finalize a Nupath proposal that would underbid other vendors while maximizing their own profit. Co-Conspirator 2 then used her official position to help finalize the contract for Nupath to provide MPD with the requested materials. The District ultimately paid Nupath $27,000 under the contract.

32.     For the MPD Recruiting Outsourcing Verifications Contract, Co-Conspirator 2 shared pre-award non-public pricing information with Ogbu. The two used that information to create and finalize a Nupath proposal that would underbid other vendors while maximizing their own profit. Co-Conspirator 2 then used her official position to help finalize the contract for Nupath to provide MPD with the requested services. In doing so, Ogbu and Co-Conspirator 2 falsely represented that Nupath had the requisite experience to obtain and perform the contract. The District ultimately paid Nupath $848,962.89 under the contract.

33. While executing the MPD Recruiting Outsourcing Verifications Contract, Nupath employed friends and family members of both Ogbu and Co-Conspirator 2. At one point, Ogbu and Co-Conspirator 2 created for Co-Conspirator 2's use a fake Nupath employee name and e-mail address so that Co-Conspirator 2 could conduct Nupath business under a name that would not be known to officials at OCP or MPD.

34. Ogbu separately took WMATA surplus devices like WMATA-owned laptops and repurposed them for Nupath employees to use while they carried out Nupath's responsibilities under the MPD Recruiting Outsourcing Verifications Contract.

35. Ogbu and Co-Conspirator 2 agreed that Co-Conspirator 2 would be paid from the profits that Nupath made from the MPD contracts. At times, Ogbu gave Co-Conspirator 2 as much as $10,000 in cash per month under this understanding. Ogbu also helped Co-Conspirator 2 purchase a car and used $20,000 from a Nupath bank account to pay for the associated car loan. Ogbu separately gave Co-Conspirator 2 over $35,000 to assist with closing costs for a new home.

*Efforts to Conceal*

36. From 2018 until mid-February 2024, Ogbu took steps to conceal and hide his involvement in the roughly $2 million worth of Highbury and Nupath transactions involving District and WMATA funds, including but not limited to: falsifying ethics disclosure forms; providing false and misleading certifications in bid submission "bidder/offeror" assurance forms; and lying to special agents from the Federal Bureau of Investigation ("FBI") when he was first approached and asked about the criminal conduct described above.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:   */s/ Timothy Visser*

                                      Timothy Visser (DC Bar No. 1028375)
Assistant United States Attorney
601 D Street NW
Washington, DC 20530
timothy.visser@usdoj.gov
(202) 252-2590

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, after consulting with my attorney, Christopher Macchiaroli, I agree and stipulate to this Statement of Offense. The Statement of Offense is a summary made for the purpose of providing the Court with a factual basis for my guilty plea. It does not include all of the facts known to me regarding these offenses. I make this statement knowingly and voluntarily because I am in fact guilty of the crimes to which I am pleading.

5/20/2024
Date

OBINNA OGBU
Defendant

## ATTORNEY'S ACKNOWLEDGEMENT

I have read this Statement of Offense and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of Offense.

5/20/2024
Date

CHRISTOPHER MACCHIAROLI, Esq.
Attorney for Obinna Ogbu

10